Good morning, Your Honors. Good morning. May it please the Court, I'm Assistant Attorney General Carl Waring. With me today is Herbert Lee Slemp, my client. With the Court's permission, I'd like to reserve two minutes for rebuttal. I have a question in terms of how would you define the constitutional right at issue here? Fair question. I think there has to be reference to the particular circumstances that Sergeant Slemp faced at the time he encounters Ms. Powell. So there has to be some kind of accounting, at least under the case laws that exist now, for the fact that Ms. Powell was a felon or suspected of a felony based upon the history of controlled drug buys that were done over the four months prior to the service of the warrant, the fact that the officers were there to search for felony evidence or evidence of felony cocaine possession. And there has to be some kind of accounting for the fact that Ms. Powell made a furtive movement while she was seated on the bench. I guess I'm having trouble defining it from the standpoint because drawing your gun can – it's really hard to say when it would be permissible and when it wouldn't be permissible. Like say, for example, if the evidence were such that a person hadn't committed a felony and they were fleeing, perhaps you can't shoot that person. Okay, there would be a defined right there. But here is the defined right that you can't – obviously they're serving a search warrant. He's a cover officer. And at the time that he's – he has some information about Ms. Powell prior to that. And she asked to move, so she's on a bed wearing large panties and some top or something. So it appears she couldn't secrete a weapon on her body. But the area around her had not been searched. So he's still a cover agent, and the cover agents are supposed to keep the searching agents while they're going through safe. And it seems undisputed. There are little minor disputes, but she put something in her mouth. And then she goes to the window. So what is the – you know, is the right that you have a right to be free from an accidental discharge? What is the constitutional right? The right begins with the analysis of the Fourth Amendment. Well, tell me what the right is. You've been living with this case. The district court defined the right in a certain way, right? Yes, ma'am. And let's assume that's too broad. What is the right? Tell me what the right is. The right in this case would be free from excessive force or force that's unreasonable, taking into account the particular circumstances of you're suspected of a serious felony offense and you're making furtive movements during the execution of the search warrant. Well, that goes to whether or not it's reasonable. How would you – what is – I understand the court is – So they're in this small room, and he has, as Judge Callahan said, he pulls out his weapon because he's the cover officer and he has it in his hand. And then she makes the furtive movement. Somebody yells she's swallowed a pill or something. She's got something in her mouth or whatever they said. And she makes the movement towards the window, and he then with the gun in his hand attempts to restrain her. So the question is, is that an unreasonable use of force? For the first part of the qualified immunity test, yes. That's the question. And I think the court's asking me to synthesize, okay, let's get to the second question about how are we going to define the right. Well, we have to say what we – you know, the first question is, if you take all the facts to the extent there's any dispute, and you look at them in the light most – resolve all material factual disputes in favor of the non-movement here, the party who's not – Mrs. – what's her name? Powell. Yes, sir. And you ask, could a reasonable jury conclude that the officer violated her Fourth Amendment right against excessive force? That's just the first abstract – you know, for us it's an abstract question. Yes, sir. And I'm sorry, I was confused. I thought you were asking me to address the second problem. And the second question is, okay, if that's the case, was that right clearly established at the time of this incident? With regard to the first problem, the analysis that the court has set forth is the Graham v. O'Connor. The three factors we're trying to figure out, what's the government interest? We've got to balance that with the amount of force that actually is put into play. In this case, the district court's error was in not analyzing the Graham v. O'Connor factors correctly. And in fairness to the district court, he didn't have the benefit – the decision that followed, the 2013 decision in Gonzales, where the court really set forth, this is how we're going to analyze the first three factors, the first one being whether or not there's a serious offense. In this decision by Judge Rice, he said, well, the officer doesn't know if she's committing any offense at all, so the first factor weighs against the defendants. But if you take a look at Gonzales, where the officers approach a vehicle – excuse me, not a person, but a vehicle that was known to be used in trafficking narcotics before, and they see furtive movements from the driver, the Ninth Circuit said that information was enough to give the officers reasonable cause to believe that there's a serious offense committed. Here, we're a step farther on the first Graham factor because we have controlled buys of cocaine in the four months preceding with Ms. Powell through confidential informants. They get a warrant to go in and look for evidence of that felony offense. In the presence of the officer, Ms. Powell reaches up and she takes what at her admission, not what Sergeant Slim sees, but at her admission. That comes later, right? She admits that later. Well, she admits it later, yes, but in possession of a felony substance that she's trying to ingest. Well, she knew it was a felony. I don't know that it was a – I gather if she'd had a prescription, it would have been okay, right? Excuse me? If she'd had a prescription for whatever that was. Then it wouldn't have been, but the point that's getting lost is in Gonzales when the individual who's driving the car takes his hand from his lap and puts his mouth – Well, let me help you out here. The furtive movement, you're saying it's destruction of evidence. That's one way for the officer to look at it. Two furtive movements, and yes, ma'am, that's the first one. And then there's the other to the window. Towards the area of the room that hasn't been searched, yes. The point I'm trying to make with Gonzales is the court didn't require those officers when deciding that first factor of a severe crime was met, didn't require the officers know what it was the driver was putting towards his mouth. They saw him putting something towards his mouth. That gave them reasonable suspicion that he was trying to destroy evidence. That's the same situation here, and that's why Judge Rice got the first element or the first prong wrong because the same circumstances or type of circumstances – No. I'm sorry, Judge. Go ahead. Finish up. The same type of circumstances that were present for Sergeant Slim were there in Gonzales, and the Ninth Circuit said, yeah, we meet prong number one or the first factor. The second factor was whether or not there's a threat to officer safety. The Matos case tells us, and this court has said on other occasions, that this is probably the most concerning element when we're trying to figure out the Graham factors because the officers obviously have a right to be concerned for their safety. And here in this case, Ms. Powell moves from her position on the bed towards a part of the room that's never been searched. She says, I was going to the window to spit it out. She also says she never told the officers why she was moving or what she was going to do. There's a picture of her room that's in the record. It wasn't a very big room. No. The room is small, but she's headed towards a part that hasn't been searched before. You can see the comforter. Where are the other officers during that time? There's Officer Brian Ausse. He's engaged with a suspect, Shannon Taylor, on the floor in the room. In the same room. Same room. In the same room. So there's four people in the room at the time? Yes, sir. And so when Ms. Powell turns from her position on the bed and heads to a direction that hasn't been searched, Sergeant Slim has the literal split second to decide, what am I going to do? And he does what any reasonable officer would do when put in that situation, a situation created by Ms. Powell. He steps forward. He advances to intercept her without taking that second he had to act to try and holster his gun on his chest holster that he had. He didn't say, Why don't you don't move? Just remain seated where you are. He did give her commands. He did? Yes, he did. After she started to move? When she started chewing the substance, he told her to spit it out. That's when she unannounced turns and moves. Did he say, Don't sit down? I don't think it's in the record if he said, Stop, stop, or if she contests that he said, Stop. The problem, because of the close proximity of the room that the courts are already describing, is that the time he stands there and says, Stop, stop, she's already, if there's a gun tucked between the wall and the mattress, she's there, and there he's still standing. Does the case law require him to say, Stop, stop, before he grabs her? Do you have to use the least intrusive means? No, Your Honor. You just can't use the type of means that offend the Constitution. Did the district court assume that Sergeant Slim accidentally shot Ms. Powell? Despite the fact that the appellee asserted in her amended complaint that shooting was intentional, let's just say under that assumption that if under the assumption that it was accidental, that Sergeant Slim would be entitled to qualified immunity, is there any evidence in the record that a person could conclude that it was other than accidental? No. I mean, I think she said that, but, I mean, what's the other evidence? No, ma'am, there isn't. The evidence that they point to that this was an intentional shooting are Sergeant Slim's statement after the fact that other officers heard as everybody's clearing the scene that he says, I shot her, which is simply a factual statement. It's true, the bullet came from his gun. It's not an admission that he intentionally shot her. Nobody who heard those statements took them to mean that he intentionally shot her because she's trying to get away. What do we do? Well, now, in Ms. Powell's deposition, she initially says that Sergeant Slim has a holster down lower and that he holstered and then he took it out and pointed it at her, but then later is that retracted and then when it turns out that he had a shoulder holster? Or what do we do? Is it disputed whether he holstered it and then took it out or not? What does the record show? It's no longer disputed. If the court takes a look at the record ER-64 for the statement of facts, you'll see where Ms. Powell tries to explain away how what she first claimed was her sole evidence, essentially the sole evidence she presented at the time of her deposition that, well, I saw him put it in his holster so he had to draw it back out. I took great pains in asking her questions. Where did you see it go? On his hip. Is there any chance it went anywhere besides his hip? No, it was on his hip. Then she finds out in our motion, in our initial motions, that he's not even wearing a hip holster. He's wearing a chest holster. Doesn't he have a second one? No, sir. He was wearing a chest holster if that's what he was wearing. Wasn't wearing something under the vest? I don't believe he was wearing a second holster. Don't look at him. Look at the record. We're not taking evidence here. Yeah, I understand, Your Honor. I don't recall that being in the record. I recall one holster on his chest, potentially one back behind his back and the small of his back. The point being, Ms. Powell clearly, when she's trying to tell us what her evidence is that this was anything other than accidental, is incorrect. All right, so just, I guess I'm just, I want to best understand your argument. All right? Under the qualified immunity, you have the first prong of what's the constitutional right and then the second of whether it's clearly established. I still don't know what you're claiming to be the constitutional. I'm assuming, but you haven't told me this yet, that you're saying he didn't violate a clearly established right, but I don't know what that right is. And then even if, but then that even being said, there was no clearly established right. But what, I think you're telling me you went on both prongs, but I still don't know what that first element, what the right is. I am saying that we went on both prongs, and it probably sounds like I'm punting to the court, but our concern with the district court's ruling is his definition of the right, as the right to be free from force which poses an unreasonable risk of inadvertent death or serious bodily harm. It doesn't take into account any of the factual circumstances confronted by the officer. Well, but then I'm saying, if you've had this case a long time, what's the right? And what I tried to identify earlier as the factual circumstances that have to be taken into account to what the right is. So tell me what the right is. Articulate the right. The right to be free from unreasonable force in a situation where you're suspected of a severe crime and you're making furtive movements. I mean, those are the factual touchstones that have to come into play when we define the right. And I see I'm down to 40 seconds. Why don't you save the balance of your time for rebuttal. Thank you, Your Honor. Let's hear from Mrs. Powell's lawyer. Yes. Good morning. Good morning, Your Honors, and my name is Mark Harris. I'm present for Mrs. Powell. What's the right at stake here, as Judge Callahan keeps asking the other side? Right. So I think Judge Rice pretty much defined the right accurately. I believe that the right that citizens have is the right, is the right, prohibition of shooting suspects who pose no significant threat of death or serious physical threat. Okay. Well, let's stop there. So the prohibition is on shooting suspects. So are you still claiming that she was shot deliberately? Well, there's kind of two pieces. That would seem like that could be answered pretty clearly either yes or no. Yes, Your Honor. That is a theory that can be brought to the jury from the evidence. Because if that's the case, then there's really no reason for us to be here, is there? Because if you can prove, if it's contested as to whether she was shot deliberately, I doubt that the state will claim that shooting her deliberately was not a violation of the Fourth Amendment. The state's theory all along has been that Sergeant Slimp shot her accidentally. There was an accidental discharge. Officers usually trained to shoot not to wing but to kill. And she was shot at an awkward angle and through the shoulder. That has all the hallmarks of an accidental shooting, particularly one when it was done at such close quarters. Yes, Your Honor. If I understand your question correctly, I believe that both theories are presentable to a jury. And I think both theories are presentable in the context of a Fourth Amendment violation. What facts do you have that would support the claim of an intentional shooting? An intentional shooting. Well, the facts are in dispute about what happened. So no, that's not it. Making something intentional, what are the facts that show that it's intentional? It can't just be that in her mind now, I've decided it was on purpose. It's got to be what are the facts giving her all imprints? He said she didn't have a very clear recollection of this, and he said he didn't either. And we're just talking about the intentional part of it? Right, just the intentional. Okay, all right. So the facts that support an intentional shooting is that he claims that he grabbed onto her. She claims that she never was grabbed or never felt being grabbed. He claims that he went hands-on while she was moving across the bed. There's evidence that she was partway out the window by the time she was shot, and that evidence not only comes from her but from the contact officer, Officer Ace. The statements are relevant that Mr. or Officer or Sergeant Slimps made after the shooting, saying, I shot her and I wish I would have missed. And he wouldn't give a statement immediately after the shooting. It was only some significant time after the shooting that he said he had shot her accidentally after he had consulted with an attorney. Those are the facts that come to mind. But the facts here, it's undisputed that he had his weapon drawn. And then your client, it seems that she wouldn't be entitled to take advantage of, initially she said she holstered it and then went out and did that. But that seems like her deposition has pretty well refuted that. That seems pretty refuted. And, Your Honor, you know, Judge Rice didn't reach the intentional shooting aspect of this and focused solely on the kind of the primary theory of the case. But he couldn't have, yeah, although if it's intentional, again, I mean, this looks like a much, much easier case than if it was an accidental shooting. Well, right. But, I mean, Your Honor, of course there are the facts that go to show that it was not an intentional shooting. And I think that a jury can be presented with the facts in both scenarios and be presented with how both scenarios. If the judge thought that there was a viable theory that it was intentional, why would we even be here right now? Why wouldn't this just go to trial and then we could take all the questions up after that? Because the judge was correct that the facts as a whole in our main theory of the case is that the shooting happened when he went hands-on with a firearm. In his hand. In his hand, with his finger on the trigger, notwithstanding that he was trained to know that doing so. Okay. Okay. That goes to the question then as to whether it was accidental. So why don't you tell us what the established constitutional right is, assuming that the gun discharged accidentally. So I think it's the same constitutional right, Your Honor. Well, you said there was a prohibition on shooting suspects. Right. That might be a little different whether it's accidental. If you put the word accidental in there, now tell me what the right is. Okay. I'll try. And the way I look at it is that you have that constitutional right, and then you take the step and you look, well, were the actions the officer took, were they reasonable or unreasonable in how they played out leading up to the shooting? I mean, there's no dispute that she was shot with a gun by Sergeant Slump. And that's a deadly. Well, you don't dispute that the cover officer could come in on executing a search warrant of this nature with a gun drawn. You don't dispute that, do you? No, Your Honor. That a cover officer can be present with his gun drawn? No. And that's what they're trained to do. And the contact officer is trained to get his gun drawn. And so his negligence would be that in training, that he should have put it back in when he went to grab her and it happened so fast. What case establishes this right? Well, is the right as far as being the right to be free from deadly force? Well, it's the right, I guess what you're saying, it's the right to be free from something that turned out badly. But deadly force implies that you're intending to shoot someone. So when you negligently shoot someone, if there's a discharge. Well, Your Honor, it's not a negligence. In the Fourth Amendment context, it's not a negligence case. Well, let's say the gun had gone off and ricocheted and hit your client. Would it be the same case or is it a different case then? It's probably a different case. But, yeah, and it depends. Did he drop the gun? I mean, I just don't know for sure. I'd have to be presented with that set of facts. But I think the facts are pretty clear here that based on the training he had, which not only involved his training not to go hands-on with a firearm with his finger on the trigger, absent a situation where he's confronted with a lethal confrontation. Well, but I think that there was evidence in there that all the circumstances of when you reholster, when you can have it, depend on all the surrounding facts. So all the surrounding facts, giving even the inferences to your client, would appear he's the cover officer, he does have his gun drawn, and the whole house has not yet been searched, and there's movement putting a pill in and movement towards the window. So what case says that under that sort of quick action that you can't grab someone and try to stop them from destroying evidence or getting out the window? With a gun in your hand. Well, I don't know if there is a case specifically on point, Your Honor, in that context. And I think Judge Rice points that out, and I think he also points out, as we argued, that that doesn't have to be the case, that when you're looking at the application of deadly force, you look at whether or not that force was derived from reasonable conduct. But you don't get to go 20-20. The 20-20 here, everyone would agree that wasn't a good idea right then because something happened. So you don't get to go 20-20. It's what at that time, what case at that time said you can't have a gun drawn and grab someone to stop them from destroying evidence and going out the window. Right, Your Honor. I don't – there isn't a case that said that specifically. So then that doesn't – isn't that bad for you on prong two? Well, I don't think so. What's your closest case? Well, I think that the Torres case is instructional in that regard. What case should the officer have read to have taught him that he would have to holster the gun before he went after her? Well, I think the officer would have known, based on the case law, that you have to account for an unreasonable mistake, and that you have to account for an unreasonable – Ordinarily, if it's an accidental shooting counsel, you might well have had a tort claim act. But you don't have a tort claim act in Washington because your client was engaged in a felony. Is that the problem? Well, Your Honor, what's remarkable about the – if this were a federal case, you could go under the Federal Tort Claims Act if you had an accidental shooting by a federal officer, and you would have a negligence claim for negligent conduct, and you would have a tort claim against the United States for which it's waived its sovereign immunity. Don't you have such a claim in Washington? Yes. There is a process to file a negligence claim in Washington. Washington has a similar process for negligent actions by police officers. Correct. Okay. And your client is barred from recovering under that act. Is that correct? Well, she may or she may not be, Your Honor. But what we find remarkable here is the situation how this occurred. I mean, Sergeant Slamp had the training that doing this clearly can result in deadly force. But you could also have the training that you go out to the range and you hit the target 99 percent of the time all the time, and then you get in a shooting and you miss every single time. I mean, they have training. It's true. But it still doesn't mean they can't be negligent. The officer didn't say that he was trained to holster his gun every time he had one out before he went after somebody. Well, Your Honor, but the record is clear that the officers are trained not to go hands-on with a firearm on the suspect because they can be shot absent some type of situation where there's going to be a lethal confrontation. And the fact here — since that area hadn't been searched, it's undisputed that she put something in her mouth and that she made a movement towards the window. And, Your Honor, I would submit that that movement — a jury may disagree with me, but her actions there did not constitute the situation where she's at risk of being killed and being shot. And he clearly knew that his conduct could result in that. If that hadn't been searched and, let's say, she got a gun right there and shot the officer, then we wouldn't be having this conversation, right? So, I mean, that could have happened. I mean, we don't get to — we know that she didn't get a gun. We know that she didn't — you know, I guess she fell out the window. But we don't get to go 20-20. It was that fast and in that close of quarters. So why couldn't an officer that was a cover officer at that point just go to grab her and then there was negligence? Because that's not his training, Your Honor. And his training is to be — to act in the correct way when confronted in those type of quick circumstances. That's why he has that training. Now, if — and I don't want to get into a speculation game necessarily, Your Honor. I don't know if you are either. You're saying he was negligent in not following his training? But then that doesn't sound like a 1983. No, I'm saying that it was the unreasonable use of force to go hands-on with a suspect, knowing with your finger on the trigger, knowing that such action is foreseeable that you would shoot and kill her. That's the Fourth Amendment violation claim. Foreseeable is kind of a negligence term. Well, Your Honor, but it's not a negligence case. Okay, so what's the case then? What's your best case? Well, I think that the district court did a good job of outlining the cases that would put him on notice that an unreasonable mistake in judgment or an unreasonable mistake. Weren't those cases intentional shooting cases as opposed to accidental shooting cases? They were intentional in the sense that the officer meant to pull the trigger. They were not — Well, that's different than accidentally. Right, but he — in a number of those cases, the person that was going to be hit by the projectile wasn't intended to be hit. Well, I guess we have a legal term. It seems inopposite when you're comparing intentional shootings with accidental shootings, if that's what the facts show here. Well, Your Honor, this wasn't an accidental shooting in the sense that — how the Supreme Court has described it, where a fleeing felon is running away, a police car slips out of gear and pins him. I mean, that's a case where we're dealing with a situation of pure negligence. Here we have an officer who has been trained not to do this after certain circumstances because this can happen and because someone can be killed, and nonetheless that is the conduct he took. And, Your Honor, that rises to a Fourth Amendment violation if a jury agrees that his mistaken judgment or unreasonable mistake led to that shooting. But I guess if he had reholstered and she'd grabbed a pistol, then he would have been wrong, right? He would have been dead wrong. And, Your Honor, on the flip side — So not every situation requires reholstering, right? That's correct. They have training where — So you have to look at the whole — all the circumstances. Right. And I think a trier of fact would do that, and they could conclude either way. Okay. Did she get up off the bed? Sorry, Your Honor? Did she get up off the bed? So what occurred, Your Honor, from — it kind of varies to a degree. But so she was on the ground. It's my recollection that the other person in her room, the contact officer, had handcuffed him. She was not handcuffed and was placed — seated on the bed. She asked if she could sit on the bed. Correct. Correct? That's correct. And I'll note right here just for — When she reached for the pill, did she get off the bed? No. When she — Her testimony is — When you went towards the window, did she get off the bed? She didn't get off the bed. She moved across — so the window wasn't very far. So she went to — I mean, it was just like a movement out the window. And so — How far was the officer from her? I think that he would have been at the foot of the bed or in that vicinity. Did he have to take a couple of steps in order to reach her? Right. Because my recollection of the facts is that he was acting as a cover officer for both — one of the contact officers in Mrs. Powell's bedroom and also one outside of her bedroom. So he was kind of standing in the doorway area of her bedroom. And he stepped over or reached over? Yeah. So when he saw her, when he believed her to be going out the window, he went and grabbed her with the firearm in his hand and the finger on the trigger. So if you were — let's just assume that a reasonable jury could find a constitutional violation. Let's just assume that. Isn't the real problem here whether the law was clearly established? Well, again, Your Honor, I would first direct the court to the cases that Judge Rice cited, and I think that that's instructional. And I also think that Torres and the Henry cases are instructional as well, where they say that, hey, listen, you didn't mean to shoot the person, but you're on notice that if you make an unreasonable mistake in the application of deadly force, then you have to account for it. And then at that point, it all goes back to the reasonableness of the shooting itself. Okay. Okay. Thank you, Judge. Thank you. I recognize I just have half a minute here. The right that the court should define in this case is whether at the time Ms. Powell moved from her position on the bed towards an unsearched portion of the room, she had the right to be free from physical restraint while the officer was holding a service weapon.  We think that right has enough touchstone to the factual context confronting Sergeant Slamp as compared to the way the right was defined by the district court below, because the district court's right, the definition of it, and the cases the court cited, cover a spectrum of police conduct from putting the spikes out to shooting pepper balls into a crowd. With regard to what case makes it clear, there is no case. In this case, the only case that bears on this issue is the Luna case, where it was okay for the border enforcement agent to physically pursue somebody he thought was an illegal alien dealing in drugs while he still had a service weapon drawn. And then with regard to the training issue, Your Honors, that was brought up, I just asked the court to take a look at ER 28 at page 28, lines 1 through 6, where it was testified very clearly that in the case of furtive movements, the training does not require officers to first holster their weapon. For these reasons, we ask the court to reverse the district court's denial of summary judgment. Thank you. Thank you both for your arguments. Thank you, counsel. We appreciate your arguments and matters submitted at this time. That ends our session for today. All rise. The court for this session stands adjourned.
judges: Paez, Bybee, Callahan